IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MIKE RODRIGUEZ,

Plaintiff,

v.                                                           CV 09-0400 RB/GBW

C.M.S., Medical Provider for
SNMCF, and FNU ARNOLD, Dr.,

Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Defendants' *Martinez* Report filed October 30, 2009, (*Doc. 17*) and Plaintiff Mike Rodriguez' Complaint (*Doc. 1*), filed on April 27, 2009. Mr. Rodriguez was given until November 30, 2009, to respond to the *Martinez* Report, however, he has failed to do so. *See Doc. 16.* The Report will be construed as a motion for summary judgment.[1]  Having considered the pleadings and the relevant law, the Court recommends that Mr. Rodriguez' Complaint be dismissed with prejudice.

### PROCEDURAL BACKGROUND

Mr. Rodriguez, a former prisoner[2] who is proceeding *pro se* and *in forma pauperis*,

---

[1] In my Order for *Martinez* Report filed on September 8, 2009, I put the parties on notice that the *Martinez* Report could be used in a variety of ways, including when deciding whether to grant summary judgment, either on motion or *sua sponte*. *See Doc. 14* at 2-3.

[2] Mr. Rodriguez was incarcerated at Southern New Mexico Correctional Facility ("SNMCF"), where the alleged incidents took place, when he initiated this suit on April 27, 2009. *Doc. 1.* However, on December

filed this civil rights action brought under 42 U.S.C. § 1983 on April 27, 2009. *Doc. 1.* Mr. Rodriguez alleges that Defendants C.M.S. and Dr. Arnold[3] showed deliberate indifference to his medical needs by failing to provide him with adequate medical care in violation of his Eighth Amendment rights. *See id.* at 7. Mr. Rodriguez is seeking declaratory and injunctive relief, as well as compensatory damages in the amount of $50,000.00 against each Defendant, and punitive damages in the amount of $4,000,000.00 against each Defendant. *Id.* at 8.

Defendants have filed an Answer and a *Martinez* Report denying the Complaint's allegations and asserting that Mr. Rodriguez has failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). *See Docs. 13 & 17.* They further contend that Mr. Rodriguez has failed to state a cognizable Eighth Amendment claim. *Id.*

For the reasons stated herein, the Court recommends that Defendants' *Martinez* Report be treated as a motion for summary judgment, which should be granted, and that all claims against Defendants be dismissed with prejudice.

---

3, 2009, Mr. Rodriguez left a message with the Court indicating he has been paroled and he now appears to reside in Mesilla Park, New Mexico. *Docket Sheet*, COURT ONLY entry entered on 12/03/2009.

[3] Mr. Rodriguez' Complaint originally also named Joe Williams, Michael Heredia, and Maureen Lnu as Defendants. *See Doc. 1.* However, those Defendants were dismissed *sua sponte* by Judge Brack on July 6, 2009. *See Doc. 9.*

**STANDARD OF REVIEW**

I.      *Consideration of Martinez Report*

In their *Martinez* Report, Defendants seek dismissal of Mr. Rodriguez' claims pursuant to FED. R. CIV. P. 12(b)(6) and assert the affirmative defense of failure to exhaust available administrative remedies based on materials submitted within the *Martinez* Report.  *See Doc. 17.*  Because the Report requires consideration of factual material outside the pleadings, the Court recommends that Defendants' request for dismissal for failure to state a claim be treated as one for summary judgment.  *See* FED. R. CIV. P. 12(b) (if matters outside the pleadings are submitted to, and not excluded by the court, on a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6), the motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  *See also Steele v. Federal Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003) ("If the defendant files a motion to dismiss requiring consideration of additional factual material, the court should convert the motion to one for summary judgment and ensure that the prisoner is given proper notification of the conversion.").  In this regard, the Court notes that in the initial Order directing submission of a *Martinez* Report (*Doc. 14*), the parties were advised, pursuant to *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991), that their submissions could be used in

deciding whether to grant summary judgment. Additionally, Mr. Rodriguez, who is proceeding *pro se*, was afforded an opportunity to respond to the *Martinez* Report and to present conflicting evidence to controvert the facts set forth therein.

II.     *Summary Judgment*

Summary judgment is proper if the movant demonstrates that there is "no genuine issue as to any material fact" and that he is "entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted).

Here, the Court notes that "[a] *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the non-moving party must

4

"identify specific facts that show the existence of a genuine issue of material fact," *Munoz v. St. Mary-Corwin Hospital,* 221 F.3d 1160,1164 (10th Cir. 2000), and conclusory allegations are insufficient to establish an issue of fact which would defeat the motion. *Hall v. Bellmon,* 935 F.2d at 1109-1110. Additionally, in a summary judgment posture, the verified Complaint and the *Martinez* Report may be treated as affidavits. *Hall v. Bellmon,* 935 F.2d at 1111.

III.    *Exhaustion of Remedies*

Under 42 U.S.C. §1997e(a) of the Prisoner Litigation Reform Act of 1995 ("PLRA"), a prison inmate is required to complete the prison's administrative process before suing over prison conditions. *Booth v. Churner,* 532 U.S. 731, 733 (2001). "There is no question that exhaustion is mandatory under the PLRA" and that unexhausted claims cannot be brought in court. *Jones v. Bock,* 549 U.S. 199, 199-200 (2007) (internal citation omitted). Even where the available remedies would appear to be futile at providing the kind of remedy sought, the prisoner must exhaust the administrative remedies available. *See Booth v. Churner,* 532 U.S. at 740-741; *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002). The PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).; *see also Jernigan*, 304 F.3d at 1032. An inmate must do more than initiate the administrative grievance process;

he must also complete it prior to filing suit. *Jernigan*, 304 F.3d at 1032.

Additionally, in a suit governed by the PRLA, "[f]ailure to exhaust is an affirmative defense; a plaintiff is not required to plead or demonstrate exhaustion in the complaint." *Gallagher v. Shelton*, --- F.3d ----, 2009 WL 4047952 at *2 (10th Cir. 2009); *Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). A defendant must prove: (1) administrative remedies were available to the plaintiff, and (2) the plaintiff failed to exhaust these remedies. *Purkey v. CCA Detention Center*, 263 Fed. Appx. 723, 726 (10th Cir. 2008).

IV.    *Inadequate Medical Treatment Under Eighth Amendment*

"It is well established that prison officials violate the Eighth Amendment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.' . . . 'This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (same). In order to prevail on an Eighth Amendment claim based on medical indifference, a plaintiff must prove two elements: (1) objectively, that his medical needs

were sufficiently serious; and (2) subjectively, the prison officials acted with a sufficiently culpable state of mind. *Self v. Crum*, 439 F.3d 1227, 1230-31 (10th Cir. 2006).

Under the objective component, a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (internal quotations and citation omitted); *see also Kikumura*, 461 F.3d at 1292 (same). Under the subjective component, a prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Nevertheless, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner" and a "complaint about 'an inadvertent failure to provide adequate medical care' or 'that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" *Kikumura,* 461 F.3d at 1291 (quoting *Estelle,* 429 U.S. 97, at 105-06); *see also Mata,* 427 F.3d at 751 (same). Likewise, a prisoner's disagreement with the course of treatment prescribed and given by medical staff does not arise to a claim of Constitutional dimension. *E.g., Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1142 (10th Cir.

2005); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

## MATERIAL FACTS[4]

On September 16, 2008, Mr. Rodriguez injured himself while picking up a trash compactor with another inmate.  *Doc. 1* at 2; *Doc. 17* at 3.  The next day, Mr. Rodriguez noticed a small lump on his side.  *Doc. 1* at 2.  On September 19, 2008, Mr. Rodriguez went to the clinic and was examined by the sick call nurse.  *Doc. 1* at 2; *Doc. 17* at 3.  The nurse noted swelling and tenderness to Mr. Rodriguez' right groin area and advised Mr. Rodriguez that he had a hernia.  Mr. Rodriguez was prescribed Ibuprofen and advised to avoid strenuous exercise and heavy lifting.  *Doc. 17*, Exhibit A-1.

On September 17, 2009, Mr. Rodriguez filed a grievance concerning his medical treatment SNMCF.  *Doc. 1* at 7.

On September 20, 2009, Mr. Rodriguez submitted a second sick call request for his hernia injury and he requested to be seen by a physician.  Mr. Rodriguez' request was triaged and he was advised that he had a scheduled appointment with the doctor on September 24, 2009.  *Doc. 17*, Exhibit A-2.

On September 23, 2008, Mr. Rodriguez was seen for a routine psychiatric evaluation.  *Doc. 17*, Exhibit A-3.  During the evaluation, Mr. Rodriguez reported doing "pretty good,"

---

[4] All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all reasonable inferences, to Mr. Rodriguez.  *See Hall v. United Parcel Serv.*, No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D.Kan. July 31, 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

and the treating physician assessed him as stable and euthymic.[5]  *Doc. 17*, Exhibit A-3.

On September 24, 2008, Mr. Rodriguez was seen by a physician's assistant ("PA"). *Doc. 17* at 3, Exhibit A-4.  He reported pain in his pubic and right groin area and requested Tylenol for the pain.  *Id.*  Upon examination, Mr.  Rodriguez was assessed with suprapubic and right groin area tenderness and was prescribed Tylenol.  *Id.* at Exhibit A-4.  The nursing staff was instructed to order Mr. Rodriguez a hernia belt and he was to follow up with a physician in six weeks for evaluation.  *Id.* at Exhibits A-4 & A-5.

On September 25, 2008, Mr. Rodriguez was examined by a nurse for an annual Health Maintenance Update.  *Doc. 17*, Exhibit A-6.  Mr. Rodriguez had no complaints at the time of the encounter.  *Id.*  Also on that day, Mr. Rodriguez went to the clinic and complained that his hernia was swollen to the nurse on staff.  *Doc. 1* at 3.  The nurse gave Mr. Rodriguez Tylenol for the pain.  *Id.*

On October 1, 2008, Mr. Rodriguez was again in pain and went to the clinic.  *Doc. 1* at 3.  He attempted to see the doctor but was informed that he was not scheduled to see the doctor until the next week for his follow up.  *Id.*

On October 5, 2008, Mr. Rodriguez went to the infirmary where he was seen by a nurse.  Mr. Rodriguez was given an examination and it was determined that he had a

---

[5]   "Euthymic" is a clinical word used meaning "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated."  Definition taken from http://medical-dictionary.thefreedictionary.com/euthymic

palpable hernia on his right side.  *Doc. 17*, Exhibit A-7.  Mr. Rodriguez was given Tylenol and a hernia guard, which was to be worn whenever he was up and moving around.  *Id.* A meeting was scheduled for Mr. Rodriguez to see a medical personnel the next day for further evaluation.  *Id.*

On October 6, 2008, Mr.  Rodriguez went to the clinic, but was told by the nurse that the doctor was not in.  *Doc. 1* at 3.  The following day, Mr. Rodriguez was seen by a nurse in the infirmary.  *Doc. 17*, Exhibit A-9.  He complained of a lot of pain and a firm, round lump was palpated at the scrotal area on Mr. Rodriguez' right side.  *Id.*  Mr. Rodriguez was prescribed 7.5 mg of Mobic[6] to be taken twice a day and was given a medium hernia belt by order of the PA.  *Id.*

On October 8, 2008, Mr. Rodriguez was seen for a follow up by the PA.  *Doc. 17*, Exhibits A-11 & A-12.  Mr. Rodriguez reported that he had slept well as a result of the medication but that he still had pain in his right groin.  *Id.*  Mr. Rodriguez was instructed to follow up in one week and to continue his medications as ordered the previous day.  *Id.*

On October 15, 2008,[7] Mr. Rodriguez was seen for a follow up by Dr. Arnold.  *Doc. 17*, Exhibit 12.  At the time of the assessment, no hernia was palpated and Dr. Arnold noted

---

[6] Mobic is used to treat pain and/or inflamation.  Information taken from  http://www.medicinenet.com/meloxicam/article.htm

[7] Mr. Rodriguez references this date as October 14, 2008, however the Health Service Request form detailing that visit is dated October 15, 2008.  *See Doc. 17*, Exhibit 12.

no evidence of an inguinal hernia.  *Id.*  He further noted, "if hernia present it is a reducible,[8]

small hernia."  *Id.*  Mr. Rodriguez was ordered to continue using the hernia belt, to return

to the clinic if his hernia reappeared, and otherwise to return three to four weeks out for

a follow up.  *Id.*

On October 21, 2008, Mr. Rodriguez acknowledged receipt of his second hernia belt.

*Doc. 17*, Exhibit A-13; *Doc.1* at 5.  Over the next couple of days Mr. Rodriguez was still in

pain so he went back to the clinic on November 3, 2008.  *Id.*  The nurse noted Mr.

Rodriguez' testicles were not worse since the last time he saw Dr. Arnold and set him up

with another appointment to see a doctor.  *Doc. 17*, Exhibit A-14.

On November 6, 2008, Mr. Rodriguez was seen by a PA for his requested follow up.

*Doc. 17*, Exhibit A-15.  Mr. Rodriguez was assessed with a moderate sized inguinal hernia.

*Id.*  He contends the PA told him he probably was going to need surgery and that she

would refer him to a specialist within a month.  *Doc. 1* at 5.  Mr. Rodriguez was prescribed

Ibuprofen and was told not to lift anything over ten pounds.  *Doc. 17*, Exhibit A-15.  After

that meeting, the PA consulted Dr. Arnold regarding whether the hernia was still reducible

and its current size.  *Id.* at 7.  Then, on November 11, 2008, the PA prescribed 100 mg of

docusate sodium, a stool softener, to be taken three times a day for 90 days.  *Id.* at Exhibit

---

[8] A reducible hernia is "a hernia in which the contents of the sac can be returned to their normal
location by manipulation."  Information taken from http://www.yourdictionary.com/medical/reducible-hernia

A-16.  Mr. Rodriguez was additionally instructed to continue wearing his hernia belt and

was to follow up in one to two weeks.  *Id.* at 7.

On December 9, 2008,[9] Mr. Rodriguez was seen again by Dr. Arnold regarding his

hernia.  *Doc. 1* at 6; *Doc. 17* at 8.  At that time, Mr. Rodriguez' testicles were not enlarged,

and there was no visible palpation.  *Doc. 17*, Exhibit A-19.  Dr. Arnold told Mr. Rodriguez

that if he was sent to a surgeon, and no defect was present upon examination, the surgeon

would not operate on Mr. Rodriguez.  *Id.*  Mr. Rodriguez was instructed to continue

wearing his hernia belt and was to follow up in two weeks.  *Id.*

On December 23, 2008, Mr. Rodriguez was seen again by a the PA.  *Doc. 1* at 6; *Doc.*

*17* at 8.  Mr. Rodriguez' right testicle was slightly swollen, but there was no palpable mass

and no defect in the right inguinal canal.  *Doc. 17*, Exhibit A-21.  Mr. Rodriguez was

assessed with a right inguinal hernia of moderate size, which was reducible.  Mr.

Rodriguez was instructed to return later for a follow up.  *Id.* at 9.

On December 30, 2008, Mr. Rodriguez had a cold and tried to see the PA for

evaluation.  *Doc. 1* at 6.  However, he was turned away by the nurse.  *Id.*

On January 13, 2009, Mr. Rodriguez was seen by the PA and reported that his

testicles were not inflated at that time.  *Doc. 17*, Exhibit A-22.  There was no palpable hernia

---

[9] In between November 11, 2008, and December 9, 2009, Mr. Rodriguez was seen for a routine psychiatric evaluation on November 19, 2008, *Doc. 17*, Exhibit A-17, and by a mental health expert on December 3, 2008, *id.* at Exhibit A-18.

noted, but Mr. Rodriguez was assessed with right inguinal pain. *Id.* The consultation was discussed with Dr. Arnold and Mr. Rodriguez was encouraged to wear his hernia belt. *Id.* Additionally, Mr. Rodriguez' prescriptions for Ibuprofen and Colace were renewed as KOP (Keep on Person) medications. *Id.*

On January 20, 2009, Mr. Rodriguez was seen for another follow up visit with the PA. *Doc. 17* at 9. Upon examination, tenderness to Mr. Rodriguez' right inguinal canal was noted. *Id.* at Exhibit A-23. Mr. Rodriguez' testicles, penis and scrotum were all within normal limits. *Id.* Mr. Rodriguez was instructed to continue his current medication regimen and continue wearing his hernia belt. *Id.*

On April 24, 2009, Mr. Rodriguez' sick call request to see a physician about his hernia was triaged and an appointment was made for April 27, 2009. *Doc. 17* at 10. On the 27th, Mr. Rodriguez was seen by a physician for his hernia. *Id.* at Exhibit A-28. Mr. Rodriguez complained that he felt his hernia had gotten worse. *Id.* Mr. Rodriguez was assessed with a mass that was most likely a moderate sized femoral hernia that was spontaneously reducible. *Id.* The physician noted that an ultrasound would be helpful in resolving whether Mr. Rodriguez had a femoral or inguinal hernia and assessing his right testicle tissue density as well as color flow patterns. *Id.*

On April 27, 2009, Mr. Rodriguez filed the instant Complaint in federal court.

On April 30, 2009, Mr. Rodriguez was seen by a physician for a follow up. *Doc. 17*, Exhibit A-29. Upon examination, Mr. Rodriguez' testicles were normal and equal. *Id.* Mr. Rodriguez was assessed with an indirect inguinal hernia. *Id.* Mr. Rodriguez was directed not to lift anything over fifteen pounds and was directed to continue wearing his hernia belt. *Id.*

On May 26, 2009, Mr. Rodriguez was seen in the chronic care clinic for evaluation of diabetes and for his hernia. *Doc. 17* at 11. Upon examination, Mr. Rodriguez was assessed with a right inguinal hernia and Diabetes Mellitus II. *Id.* at Exhibit A-31. Mr. Rodriguez was prescribed Metformin and Aspirin and laboratory tests were ordered. *Id.*

On June 16, 2009, Mr. Rodriguez was seen by the PA. *Doc. 17* at 12. Mr. Rodriguez wanted to know if his request for hernia repair surgery had been approved. *Id.* at Exhibit A-32. Mr. Rodriguez was advised that he did not meet the criteria for hernia repair. *Id.* Mr. Rodriguez requested to be scheduled with a physician. *Id.*

On June 23, 2009, Mr. Rodriguez was seen by a physician. *Doc. 17*, Exhibit A-33. Mr. Rodriguez was assessed with a reducible right inguinal hernia. *Id.* The physician noted he would complete a request for a surgical consultation. Mr. Rodriguez was advised that if he experienced any severe pain or was unable to reduce the hernia, he was to let a nurse know immediately and he was instructed not to strain himself by lifting anything. *Id.*

On July 1, 2009, Dr. Arnold approved Mr. Rodriguez' surgical consultation request,

and he was scheduled to see a surgeon on July 23, 2009. *Doc. 17*, Exhibit A-34.  On July 23, 2009, Mr. Rodriguez' appointment was rescheduled for August 13, 2009. *Id.*  On July 27, Mr. Rodriguez was seen for a follow up regarding his hernia. *Id.* at Exhibit A-35.  It was noted that Mr. Rodriguez was waiting for hernia repair and that his previous appointment had been rescheduled. *Id.*  Upon examination, Mr. Rodriguez' hernia was palpable below the right coastal margin and into the scrotum. *Id.*  Mr. Rodriguez was to inform the medical staff if the hernia was painful or if he was not able to reduce it. *Id.*

On August 13, 2009, Mr. Rodriguez was seen by a surgeon who recommended surgical repair of the hernia. *Doc. 17*, Exhibit A-36.  On August 17, 2009, a consultation request was submitted for surgical repair of Mr. Rodriguez' hernia and his surgery was scheduled for September 8, 2009. *Id.*

On September 9, 2009, Mr. Rodriguez underwent elective surgery to repair his enlarging symptomatic reducible right inguinal hernia. *Doc. 17*, Exhibit A-37.  The hernia was repaired and fixed with mesh. *Id.*  Mr. Rodriguez was transferred from SNMCF to the long-term care unit at the Central New Mexico Correctional Facility. *Id.* at Exhibit A-38. The following day, Mr. Rodriguez was examined by Dr. Mizell and he reported doing well. *Id.* at Exhibit A-40.  Mr. Rodriguez was prescribed Keflex and a consultation request was submitted for Mr. Rodriguez's surgical follow up consultation. *Id.*; *id.* at A-41.

On September 11, 2009, Mr. Rodriguez was again examined by Dr. Mizell. *Doc. 17*,

Exhibit A-42.  Mr. Rodriguez reported doing well.  *Id.*  On September 12, 2009, Mr. Rodriguez was examined by Dr. Arnold.  *Id.* at Exhibit A-43.  Other than slight groin pain, Mr. Rodriguez reported doing well.  *Id.*  Mr. Rodriguez was to continue with his current plan of care and was to follow up with the surgeon in one to two weeks.  *Id.*

On September 13, 2009, Dr. Arnold examined Mr. Rodriguez.  *Doc. 17*, Exhibit A-44.  Mr. Rodriguez reported mild pain in his right groin.  *Id.*  Mr. Rodriguez' blood glucose levels were to be checked on Monday, Wednesday and Friday and his dressing was to be changed daily.  *Id.*  On September 14, 2009, Dr. Mizell examined Mr. Rodriguez for a follow up.  *Id.* at Exhibit A-45.  Mr. Rodriguez reported doing well and Dr. Mizell ordered a follow up with the surgeon in seven to ten days.  *Id.*

On September 22, 2009, Mr. Rodriguez was examined by the surgeon for a follow up.  *Doc. 17*, Exhibit A-46.  Mr. Rodriguez was reported to be doing well and was discharged from the surgeon's care.  *Id.*  On September 29, 2009, Mr. Rodriguez was transferred from the long-term care unit back to SNMCF.  *Id.* at Exhibit A-47.

## ANALYSIS

As a preliminary matter, the Court notes that Mr. Rodriguez' claims for declaratory and injunctive relief are now moot because he is no longer confined at SNMCF, where the alleged violations occurred. *Cf. Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (holding prisoner's release mooted his claims seeking declaratory and injunctive relief as

to conditions of confinement).

Moving on to Mr. Rodriguez' claims for monetary relief and construing them liberally, he alleges that Defendants ignored his necessity for medical care in violation of his Eighth Amendment rights.  Mr. Rodriguez further asserts this amounted to deliberate indifference on the part of Defendants.

I.      *Exhaustion under the PLRA*

Defendants have raised the affirmative defense that Mr. Rodriguez failed to exhaust his administrative remedies under the PLRA with regard to his alleged claims.  *See Doc. 17* at 16-17.  In support of this contention, Defendants have submitted a *Martinez* Report which contains an affidavit by Ralph Casaus, an Administrative Law Judge/Grievance Coordinator for the New Mexico Corrections Department ("NMCD"),[10]  along with the Inmate Grievance Handbook for NMCD.  *See Doc. 17*, Exhibits C & 1.  As noted above, a defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts*, 484 F.3d at 1241.  Defendants must prove: (1) administrative remedies were available to the plaintiff, and (2) the plaintiff failed to exhaust these remedies.  *Purkey*, 263 Fed. Appx. at 726.

Defendants point to Mr. Casaus' affidavit in which he states that, "after a complete

---

[10] NMCD is the state agency that oversees various correctional facilities in New Mexico including SNMCF.  *See* http://corrections.state.nm.us/prisons/publicinst.html.

review of the grievance appeal logs for the NMCD, Mike Rodriguez did not file any appeal of any grievance he may have filed while he was incarcerated within the NMCD." *Doc. 17*, Exhibit C.  Defendants argue that, in order for Mr. Rodriguez to have exhausted his remedies, in addition to filing his grievance, he would have needed to appeal the grievance.  *Id.* at 16.  Because he failed do so, they contend that he has not exhausted his administrative remedies.  *Id.*

Defendants are correct that inmates are required to do more than initiate the administrative grievance process, they are required to actually complete it prior to filing suit.  *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002).  However, the Tenth Circuit has held that "failure [by the institution] to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy *unavailable*."[11]  *Id.* (emphasis added).  In his Complaint, Mr. Rodriguez asserts that he filed a grievance on September 17, 2008.  *Doc. 1* at 7.  He further contends that the grievance was never answered and that he never received a notice saying his grievance had been denied.  *Id.* At this stage of the proceeding, the Court must take Mr. Rodriguez' factual claim as true. Such a failure to respond to a grievance would be a violation of the institution's grievance

---

[11] Mr. Rodriguez must exhaust only those administrative remedies that are *available* to him. *See* 42 U.S.C. § 1997e(a)

policy[12] and would support a finding that he exhausted his administrative remedies.

Thus Defendants have failed to meet their two-fold burden of establishing that Mr.

Rodriguez has not exhausted his administrative remedies. *See Purkey*, 263 Fed. Appx. at

726. Accordingly, the Court will consider the merits of Mr. Rodriguez' claims below.

II.    *No Genuine Issue as to any Material Fact*

As discussed in detail *supra*, in order for Mr. Rodriguez to prevail on his claim, he

must prove two elements: (1) objectively, that his medical needs were sufficiently serious;

and (2) subjectively, the prison officials acted with a sufficiently culpable state of mind. *Self*,

439 F.3d at 1230-31. Since the Court reviews these claims in summary judgment posture,

Defendants must set forth specific facts showing that there is no genuine issue as to any

material fact regarding Mr. Rodriguez' claims. *Anerson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251 (1986). Upon a review of the record, it is clear that Defendants have met this burden.

Defendants' *Martinez* Report contains numerous medical records all evidencing that

Mr. Rodriguez received ample medical care while incarcerated at SNMCF. *See pp. 8-16,*

*supra.* While Mr. Rodriguez was not always seen right away upon every request,

---

[12] The Inmate Grievance Handbook states that "the Grievance Officer shall notify the grievant of receipt of a grievance," and that if the "Officer does not acknowledge receipt of the grievance in writing within five working days after receipt of the grievance, the Grievance Officer will notify the grievant in writing as to the date the grievance was received and the status of the grievance." *Doc. 17*, Exhibit 1 at CD-150501. The handbook additionally states that "[n]o more that 90 working days will pass from the filing of a grievance by an inmate to the final decision," and that "[i]n the event the grievance is not disposed of within the time limit, the inmate shall be deemed to have exhausted administrative remedies for that specific complaint." *Id.* at CD-150500.

Defendant CMS provided Mr. Rodriguez with continuous treatment for his hernia, including frequent consultations with nurses on staff, physician's assistants, and medical doctors.  Additionally, Defendant Dr. Arnold continuously evaluated and tracked Mr. Rodriguez' condition until he approved him for a surgical consultation on July 1, 2009. Then, on September 9, 2009, Mr. Rodriguez underwent elective surgery to repair his hernia. Following his surgery, in addition to his follow ups with the surgeon, Dr. Arnold also examined Mr. Rodriguez and ordered that his blood glucose levels were to be checked three times a week.  Thus, even assuming that Mr. Rodriguez' hernia represented a serious medical need, Defendants have presented facts clearly evidencing that there was no deliberate indifference on the part of Defendants regarding Mr. Rodriguez' medical needs.

In his Complaint, Mr. Rodriguez' asserts that Defendants "totally ignored" his requests for medical treatment. *Doc. 1* at 7.  However, the facts taken from Mr. Rodriguez' Complaint and the Defendants uncontroverted *Martinez* Report clearly supports the opposite conclusion: Mr. Rodriguez received extensive medical treatment at all times for his various complaints.  *See pp. 8-16, supra*.  What remains, therefore, is merely a difference of opinion between Mr. Rodriguez and the Defendants as to the adequacy of the treatment he did receive.  A plaintiff's difference of opinion with the medical judgment of a prison doctor is insufficient to support a claim of cruel and unusual punishment.  *See Perkins*, 165 F.3d at 811 (stating that "a prisoner who merely disagrees with a diagnosis or a prescribed

course of treatment does not state a constitutional violation"); *Olson*, 9 F.3d at 1477 (noting that a difference of medical opinion between plaintiff and prison doctor "does not support a claim of cruel and unusual punishment").

Because no reasonable jury could find that Defendants were deliberately indifferent to Mr. Rodriguez' medical needs and, therefore, could not return a verdict for Mr. Rodriguez, summary judgment should be granted in favor of Defendants.

## CONCLUSION

Mr. Rodriguez has failed to show that there is any genuine issue of material fact regarding the sufficiency of his claims against Defendants. The numerous medical records provided by Defendants as well as the facts laid out in the Complaint clearly illustrate that Defendants treated Mr. Rodriguez at all times during the duration of his medical condition. Further, there has been no evidence brought forth by Mr. Rodriguez, nor is there any evidence in the record to suggest that Defendants were deliberately indifferent to Mr. Rodriguez' medical needs. Thus, Defendants' *Martinez* Report should be construed as a motion for summary judgment, and it should be granted.

Wherefore,

**IT IS HEREBY RECOMMENDED** that all claims for declaratory and injunctive relief against Defendants are now **MOOT** and should be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that Defendants' *Martinez* Report (*Doc. 17*) be

treated as a motion for summary judgment with respect to Mr. Rodriguez' remaining

claims and be **GRANTED** since no issue of material fact remains and those claims should

be **DISMISSED WITH PREJUDICE**.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

UNITED STATES MAGISTRATE JUDGE